PONDER, Justice.
 

 The plaintiff demands to be recognized as the adopted child and forced heir of Mathilde Molaison, deceased; the annulment of a certain instrument purporting to renounce her interest in the succession; and to be declared the owner of .an undivided one-third interest in the estate of the deceased. Her demands were rejectd by the lower court and she has appealed.
 

 The instrument sought to be annulled reads as follows:
 

 “State of Louisiana
 

 “Parish of Vermilion
 

 “On this 9th day of March, 1943, before me the undersigned Notary Public and two competent witnesses, came and appeared: Varina Ella Smith, a. resident of the Parish of Acadia, Louisiana, who declared that it was her wish and desire to renounce the succession of Mathilde Molaison Greene, of Abbeville, Louisiana, who departed this life March 7th, 1943, to whose succession she is called by virtue of having been adopted by the said Mathilde Molaison Greene as a child or daughter many years ago, and that she does hereby renounce the succession of said Mathilde Molaison Greene and abandon her rights as an heir at law.
 

 
 *381
 
 “Appearer further declared that this renunciation is made as a matter of conscience on her part, she having long considered many things touching her adoption and her rearing as a child by others than Mathilde Molaison Greene, and considering also the help and assistance given her in the past by J. N. Greene her husband, and considering what she knows to have been their wishes in the matter of her succession; these wishes being that she, appearer, would at the death of Mathilde Molaison Greene, accept Five Thousand Dollars, from the legatees under the last will of Mathilde Molaison Greene, and renounce her right to any more.
 

 “Having received Five Thousand Dollars from Alzina LeBlanc Scheidt, named Executrix and Residuary Legatee in the last will of Mathilde Molaison Greene and for the reasons stated above, she makes this renunciation, and sign the same with a clear conscience and free will.
 

 “Signed on this the 9th day of March, 1943, at Abbeville, Louisiana, in the presence of Chas. C. LeBlanc and Wesley Steen, competent witnesses.
 

 “(Sig.) Varina Ella Smith
 

 “Witnesses:
 

 “(Sig.) Chas. C. LeBlanc
 

 “(•Sig.) J. Wesley Steen
 

 “(Sig.) Paul Langlinais,
 

 “Dy. Clerk of Court and Ex-Officio Notary Public, Vermilion Parish, La.”
 

 The following is written on the back of the above instrument:
 

 “The renunciation on the reverse side of this sheet is hereby accepted by Alzina LeBlanc Scheidt, on behalf of herself and the other legatees named in the last will of Mathilde Molaison Greene.
 

 “(Sig.) Alzina LeBlanc Scheidt
 

 “Witnesses:
 

 “(Sig.) Chas. C. LeBlanc
 

 “(Sig.) J. Wesley Steen
 

 “(Sig.) Paul Langlinais,
 

 “Dy. Clerk of Court ana Notary Public, Vermilion Parish, La.”
 

 Mathilde Molaison died, testate and without issue, on March 7, 1943. In her will she bequeathed her home and its contents to her niece, Mrs. Alzina LeBlanc Scheidt. She bequeathed legacies to certain parties and the residue or remainder of her estate, which constituted the bulk of her estate, to her aforementioned niece.
 

 The plaintiff, Varina Ella Smith, now the wife of Jules Greene, was fifty-two years of age at-the time this case was tried in the lower court. Her mother died when the plaintiff was an infant, four months of age, and her father married Mathilde Molaison some two years thereafter when the plaintiff was some two or three years of age. After Mathilde Molaison had married Issac Smith, she adopted the plaintiff as her child on October 26, 1896, by an authentic act passed before a notary public and two witnesses, which was duly recorded in the
 
 *383
 
 conveyance records of Acadia Parish. Issac Smith died a short time thereafter when the plaintiff was only six years of age. The plaintiff has never resided with her stepmother, except on occasional visits. She resided with her paternal grandmother after the death of her mother until she reached the age of seven years, at which time she was placed in a convent or boarding school. She remained in this convent and another convent until she reached sixteen years of age. She received the equivalent of a high school education at the convent and thereafter attended Southwestern Institute at Lafayette for a part of one semester. She had no permanent home thereafter until some ten or twelve years ago, at which time she established a home in Rayne, Louisiana. During the interim between the time she left Southwestern Institute and the time she established a home at Rayne, she lived with various relatives and boarded with others part of the time. She was living at the time that Mathilde Molaison died in a small house built out of rough lumber of the dimensions of twelve by twenty-four feet in a poor section in Rayne, inhabitated by people of the white and colored races. For the last twelve years her income at no time exceeded $6 or $7 per month, which was derived from her earnings, until she was placed on the relief rolls of the welfare department. She is presently suffering from an advanced stage of diabetis and a highly inflamed knee, the result of previous accidents, which makes it very difficult for her to walk or get about.
 

 Mathilde Molaison was first married to Issac A. Smith, the plaintiff’s father. Issac A. Smith died when the plaintiff was about six years of age. Thereafter and prior to the year, 1912, the exact date is not shown by the record, Mathilde Molaison married J. N. Greene, a resident of Abbe-ville, Louisiana. It appears that J. N. Greene acquired quite a large estate, which was left to his wife, Mathilde Molaison, at his death in the fall of 1937. J. N. Greene had for many years been a professional and business associate with Judge W. P. Edwards and they owned considerable property and stock in indivisión at the time of Greene’s death. They were engaged in various pursuits together. These pursuits were continued by Mathilde Molaison with Judge Edwards and at the time of her death she owned considerable property, both real and personal, in indivisión with him. This same property is presently owned by the succession in indivisión with him. The evidence shows that intimate relationship existed between Judge Edwards, J. N. Greene, Mathilde Molaison and the residuary legatee, Alzina LeBlanc Scheidt. The relationship between the Edwards’ family and the members of the residuary legatee’s family with the plaintiff was casual. They have never associated with the plaintiff and had met her only on a few occasions in the early years of the plaintiff’s life.
 

 Mathilde Molaison died in the early hours of the morning of March 7th, in the City of New Orleans, and her body was shipped
 
 *385
 
 to Abbeville for interment, arriving at the deceased’s home in Abbeville in the late afternoon of that day. Mrs. Scheidt, who had attended the deceased in her last illness, arrived at Abbeville earlier in the afternoon and went to Judge Edwards’ home where she and her husband read the will. Shortly thereafter, she phoned to Rayne and had a policeman to go to the home of the plaintiff. He carried the plaintiff to a phone in the neighborhood where the plaintiff was informed by Mrs. Scheidt that her stepmother had passed away and asked if she desired to attend the funeral. Upon being informed by the plaintiff that she would like to come but had no way, Mrs. Scheidt informed her that she would send for her. A daughter of Judge Edwards, her fiance, accompanied by Hector LeBlanc, a legatee named in the will and a brother of Mrs. Scheidt, went to the plaintiff’s home in an automobile and brought the plaintiff to Judge Edwards’ home, arriving sometime after dark. Mrs. Scheidt spent the night in the Edwards’ home in a room connecting with the one occupied by the plaintiff. Mrs. Scheidt’s husband, A. E. Scheidt, and her brother, Hector, spent the night at Mrs. Scheidt’s home. On the next morning, March 8th, between 8 and 9 o’clock, the plaintiff was called into Mrs. Scheidt’s room and introduced to Mr. Scheidt, who had arrived a short time before, and a conversation took place between the parties. The Scheidts give one version of what was said and the plaintiff gives an entirely different one. According to the Scheidts’ testimony, the plaintiff told them that she had made an agreement with Mr. and Mrs. Greene to accept $5,000 at her death and that was all she wanted because she was ill and would not need more. They testified that they informed her that the estate was worth $160,000 after the bills were paid and that the plaintiff, as an adopted daughter, was entitled to one-third of it, whereupon the plaintiff replied that she was governed by the rules of God and had made an agreement to accept $5,000. The plaintiff testified that, on that occasion, Mrs. Scheidt asked her if there was an agreement between her and her stepmother to accept $5,000 after her death. She stated that her stepmother had always told her she was going to leave the plaintiff $5,000 in her will. She stated that Mr. Scheidt spoke to her about it and told her that if she wanted to see a lawyer that Judge Edwards was a capable one. She testified that neither Mr. or Mrs. Scheidt told her that she was a legally adopted heir or anything about the value of the estate. The plaintiff also testified that her stepmother had always told her that she would leave the plaintiff $5,000 in the First National Bank with her will and that Mrs. Scheidt would be the business manager and see she got it. This conversation took place in the morning and the deceased was buried in the afternoon of that day.
 

 Judge Edwards testified that his wife told him the plaintiff wanted to go home and get
 
 *387
 
 through with the succession matter 'before she left. Mrs. Edwards testified that the plaintiff told her that she wanted to get whatever she had to do done and go home. When Judge Edwards received this information from his wife he phoned Mr. Scheidt and asked him if he intended for him to attend to the renounciation and. upon being informed by Scheidt that he did, he thereupon requested Mr. Scheidt to drive him to a law office in order to read the articles of the code dealing with renounciation of a succession. While in the car, Judge Edwards informed Mr. Scheidt that he would attend to the probating of Mrs. Greene’s will and the settlement of the succession without cost. Shortly thereafter, Judge Edwards returned home and asked for the plaintiff to be brought into his library. He asked her in effect if she desired to renounce her interest and receive $5,000 in compliance with the deceased’s desires. Upon being informed that the plaintiff did, he prepared notes. He testified that he told the plaintiff that they would have to give some reasons to support the renounciation. According to the plaintiff’s testimony, she was laboring under the impression at all times that the deceased was to leave her a gift of $5,000 and that the transaction was confected to carry out that purpose. She testified that she did not know that she was a legal heir or the value of the estate. From her testimony we gather that Judge Edwards did not explain to plaintiff her rights or the value of the estate. Judge Edwards admits that he did not explain to her what her interest in the estate was or that she was legally adopted and entitled to a one-third interest in the estate. He also admits that he did not show her the will or tell her the value of the estate. She testified in effect that she relied on Judge Edwards to look after her interest in the matter. As we view Judge Edwards’ testimony, he was evidently relying on the information he had received from the deceased and what the Scheidts had told him. He did not discuss with the plaintiff her interests or inform her of the value of the estate. He was evidently acting for the Scheidts, because he could not be the attorney for opposing parties.
 

 Sometime in the early part of the night of that day, Mr. Scheidt, at the suggestion of Judge Edwards, brought a notary public and two witnesses to Judge Edwards’ home. Upon their arrival, the notary was taken by Judge Edwards in a separate room and the instrument involved in this suit was dictated to the notary by Judge Edwards. After the instrument was typed, it was carried by Judge Edwards into the adjoining room where the plaintiff and the witnesses were sitting. Judge Edwards read the instrument to the plaintiff in the presence of the notary and the witnesses and it was signed by the plaintiff, the notary and the two witnesses. At the time it was signed no inquiry was made of the plaintiff to ascertain whether she understood her rights or the effect of the instrument she was
 
 *389
 
 signing. The notary, Mr. Paul Langlinais, deputy clerk of court for Vermilion Parish, would not state in his testimony that the plaintiff understood the import of the instrument. He stated that he understood, but would not say that the plaintiff did so. One of the witnesses, Mr. Wesley Steen, co-manager of a sirup mill, stated that when the plaintiff was asked to sign the instrument she said, “Well, I suppose so.” After the instrument was signed, Judge Edwards invited the parties to have a drink, and all the parties left the room with the exception of Mr. Charles LeBlanc, one of the witnesses to the instrument, a deputy assessor and ex-sheriff of Vermilion Parish, and. the plaintiff who remained in the room because they did not desire a drink. Mr. LeBlanc asked the plaintiff to let him see the certificate of deposit given the plaintiff by Judge Edwards, calling for $5,000 as the consideration, and he testifies that the plaintiff told him that Judge Edwards had told her that was all she could get. The consideration given to consummate this transaction was the property of Judge Edwards. He states in effect that Mr. Scheidt did not have sufficient funds with him to pay the consideration and that he, Judge Edwards, went into his own files, got the certificate and gave it to the plaintiff. Shortly after the instrument was signed by the plaintiff, Mr. Scheidt took it and proceeded to his home, with the notary and the witnesses, and an acceptance was signed on the instrument by his wife in the presence of the notary and the witnesses. After it was completed, Mr. Scheidt retained possession of it.
 

 .The plaintiff remained in the Edwards’ home until March 11th, at which time she was carried back to her home in Rayne.
 

 On March 30th, the plaintiff married Jules Greene, a nephew of J. N. Greene. The plaintiff testified that shortly thereafter she heard rumors to the effect that she had been defrauded of her rights. Upon hearing these rumors, she went to one of the attorneys representing her in this case and secured his services to investigate the matter for her. The attorney went to Crowley, the county seat of the adjoining parish, and found from the records that the plaintiff had been legally adopted by the deceased. Upon securing' this information, her attorney approached Mr. Scheidt and asked permission to see the instrument that the plaintiff had signed. The instrument had not been recorded or filed in the succession proceedings which had been instituted on March 18th. It was May 4th or 5th that the attorney approached Mr. Scheidt and Mr. Scheidt referred him to Judge Edwards. Judge Edwards referred him back* to Mr. Scheidt. It appears that the attorney made several attempts to see the instrument and after being referred back and forth without avail, the attorney then brought proceedings in the court and secured an order and it was only after the instrument had been produced by order of
 
 *391
 
 court that he had an opportunity to see its contents.
 

 •The defendants introduced letters written by the plaintiff to Mrs. Edwards and Mrs. Scheidt, dated March 17, 1943, for the purpose of showing that she was satisfied with the transaction and had ratified it. When she left the Edwards’ home, Mrs. Scheidt gave the plaintiff some of the deceased’s clothes and other articles. These letters show that the plaintiff was deeply grateful and magnified the value of these articles. It also shows that she felt highly pleased over being entertained at the Edwards’ home. However, in the letter to Mrs. Scheidt there is this statement, viz: “I had lots of visitors and you can imagine all the questions they asked but I always had a lot of things to say about the funeral, lovely flowers and how well I was received so that throws them in the dark.” The plaintiff was not asked any questions about this statement in the letter. There is a strong probability that this statement indicates that the plaintiff was instructed not to reveal what had transpired. The defendants also introduced a letter written to Mr. J. N. Greene, April 25, 1923, contain-, ing the following statements:
 

 “This is a written guarantee of my word of honor in regard to my renouncing that unjust act of adoption of which you have been made an innocent victim.
 

 “You have no idea how sorry I feel that such a thing was ever done, especially that it caused you so much unnecessary worry and unhappiness, to that extent that you even talk of selling your lovely home, etc. and going out west. Uncle, I know the west is a lovely country and I am sure very pleasant to live in; but when one has spent a life time, and such an honorable one as you have, in a certain part of the country and have all your bosom friends and comrades, not speaking of all your' own relatives that must be dear to you, in the same place, it is not so easy to detach yourself from them, so as to' speak, and make yourself acquaintances in a strange land.
 

 “What I wish you to bear in mind is this, if for any reason whatever that act of adoption has any thing to do with your going away' to another part of the country, I will ask you to please try and drive 'those thoughts out of your mind.
 

 “I never had and never will, of ever being such an ingrate to you and Aunt Mattie’s memory as to make such an unjust act, valid.
 

 “No matter what the law of man say, it is the law of God that guides my conscience concerning this in a special manner. When I die I do not want to say in dispair, “Remetre, omon dieu.” I will be more than satisfied with the $5,000 that both you and Aunt Mattie want me to have at her death. Not a cent more do I want. On the contrary, if both of you should decide my having less it is perfectly satisfactory to me. Whatever you both wish in the matter, it is also mine. I appreciate the fact that, that is money that would fall from the skies,
 
 *393
 
 as I did not earn a cent of it, and it being a voluntary gift from you and Aunt Mattie.
 

 íjí ‡ ‡ ‡
 
 Up
 
 ‡
 

 “I feel for both of you, that is why I beg of you to try and feel just as you did before you knew of that horrid and unjust act of adoption. I wish I could do something to erase it off of any record whatever and that it Would 'be forgotten forever.”
 

 The plaintiff testified that her stepmother had informed her on that occasion that she and her. husband were having trouble over the plaintiff and requested her to write the letter. She states that her stepmother dictated the letter to her. She states also that she did not know that she had been legally adopted or the import of a legal adoption. According to her testimony, she was under the impression that an adopted child was the child of a stepmother and she never knew, until her counsel had explained it to her, that she had been legally adopted or the import of it. She stated that her stepmother had informed her that she and her husband were going to leave the plaintiff $5,000, which she thought was purely a gift. She also stated that shortly after she had applied to the welfare department for assistance that her stepmother became indignant because she had told them that she was her stepchild and instructed file plaintiff not to tell people that she was her stepmother because she was the wife of another man. She further stated that on the few occasions that her stepmother visited her that her stepmother informed her that she would leave her out of the Will if she displeased her and would not leave her the $5,000. The statements in the letter referred to calls for some explanation. If the plaintiff had voluntarily written this letter, she did so to prevent Mr. Greene from leaving his home. If such a condition existed at that time, it certainly passed out of the picture on Mr. Greene’s death. There is no evidence in this record to show that Mr. Greene ever had any intention of leaving and going west. If such had been the case, it would appear that some testimony would have been offered by those so intimately associated with Mr, Greene and his wife. If the plaintiff had voluntarily written this letter, she was undoubtedly led to believe that an adoption was a horrible thing, as evidenced by the statements.
 

 The statements in the letter, to the effect: That is money falling from the sky; a voluntary gift; and not earning a cent of it; evidence the fact that it was considered purely a gift and not an agreement to abandon a legal right for a consideration.
 

 The only explanation of what prompted the writing of this letter was given by the plaintiff. Such being the case, we. have no occasion to disbelieve her.
 

 We have no doubt that it was the desire of the deceased that the plaintiff should not participate in her succession. However, the plaintiff’s testimony throughout shows that she did not know her rights and was
 
 *395
 
 laboring under the impression that whatever she recéived would be purely a gift and if the plaintiff displeased her stepmother that she would receive nothing.
 

 The plaintiff was on the witness stand in the trial.of this case for several days and was rigorously cross examined. We have read her testimony and find no discrepancies of any consequence. From the evidence in this case, she is undoubtedly a woman of limited mental capacity. She could not go through this strenuous cross examination without serious discrepancies in her testimony, if she were not telling the truth. While she was at the Edwards’ home, she was taken by Mrs. Edwards to Dr. A. A. Comeaux, the Edwards’ physician, for treatment of her swollen knee. Dr. Comeaux examined her again sometime prior to the trial of this case. He testified that the plaintiff was abnormal and suffering from a decided case of diabetes. He stated that he attributed her dullness to this disease, which had not been treated, to a large exent. He refers to her mental capacity as obtuse. On two occasions during the • trial, the plaintiff became exhausted while
 
 she was on the
 
 witness stand and had to be withdrawn in order to rest. On one of these occasions she was examined by Dr. Comeaux and he informed the court that she should be given a rest because of her condition.
 

 From a careful analysis of all the testimony in this case, it is apparant that the plaintiff was ignorant of her rights and the value of the estate at the time she signed the instrument- Her testimony evidences this fact. It is supported by the testimony of the notary and the two witnesses, before whom the act was passed. It must be borne in mind that the plaintiff did not voluntarily go to the notary and the witnesses to pass the act and that, at the time it was' passed, there was
 
 no
 
 inquiry
 
 made
 
 of the plaintiff to ascertain whether or not she understood her rights in the premises, or the import of the instrument she signed. The testimony of the notary and the two witnesses undoubtedly corroborates the plaintiff's testimony and they are disinterested witnesses. The notary would not state that the plaintiff understood the act. One of the witnesses states that the plaintiff, when requested to sign the instrument, said,
 
 “I
 
 suppose so.” The other witness states that the plaintiff told him immediately after she had signed the instrument that Judge Edwards told her that the consideration called for in the instrument was all she could get. Dr. Comeaux, a disinterested witness, who it appears had only seen the plaintiff on three occasions, indicates the fact that the plaintiff was not overly bright. Judge Edwárds, who drew up the instrument did not explain to the plaintiff her rights or the value of the estate. While the plaintiff was under the impression that Judge Edwards was representing her interests, it was error on her part because Judge Edwards could not represent her and those opposed to her interests at that time. In view of all the facts and the hasty manner and the circum
 
 *397
 
 stances prevailing at the time that the instrument was executed without the plaintiff having the advice of an attorney, this instrument should be annulled and set aside and the parties placed back in the position they occupied before it was executed. All the parties involved in this suit, except the plaintiff, have had extensive business experience and the plaintiff has had practically none. It may be that much was taken for granted when it was executed, but this does not relieve the situation because the plaintiff had a decided inferior mental capacity to the other parties. We are not prepared to say that an intentional fraud was perpretrated on the plaintiff, but the evidence does show that the opposing parties were cognizant of all the facts and the plaintiff was ignorant of them and laboring under an entirely different impression.
 

 Where parties of somewhat equal experience and mental capacity enter into an engagement, the courts.are reluctant to disturb it unless there is fraud. However, it is the duty of the courts to carefully and painstakingly investigate the circumstances surrounding transactions between a person of limited mental capacity and one experienced in business affairs, in order that substantial justice might be meted out.
 

 The defendants introduced a letter from Jules Greene to the plaintiff, dated October 16, 1912. This letter was written to the plaintiff when she was approximately eighteen years of age. In it the writer informed the plaintiff that he would not marry her because he had fallen in love with another. It is stated therein that he told the other person that he was going to marry a girl who was worth $25,000, referring to the plaintiff. It. is also stated therein that the plaintiff would some day inherit from her stepmother and that her stepmother would be heartbroken when she heard of the writer’s action. The plaintiff testified that she did not pay any attention to this statement at that time. This letter might show that that writer knew or had information, but does not necessarily show, that the plaintiff knew she was the legally adopted daughter of her stepmother.
 

 Another letter was introduced to show that the plaintiff was educated because of the phraseology used therein. We have no doubt that persons educated at a convent receive a good literary training but this does not mean that they are familiar with business and legal affairs.
 

 The defendants suggest that the present suit was instituted at the instance of Jules Greene, but there is nothing in the record to show this fact, because the plaintiff testified that Mr. Whitney Mouton was the first person who told her she had been defrauded of her rights. However, if the suggestion were true, it would show that the plaintiff was very credulous and easily influenced.
 

 
 *399
 
 The effects inventoried in the succession of the deceased is appraised at $225,-421.54, one-third of this amount is more than $75,000. The plaintiff is entitled to the third interest.
 

 Counsel for the-plaintiff offered to return the $5,000 to Mrs. Scheidt and her husband before this suit was instituted, which was refused.
 

 For the reasons assigned, the judgment of the lower court is reversed and set aside. The instrument purporting to be a renounciation, passed before Paul Langlinais, deputy cleric of court and ex-officio notary public of Vermilion Parish, on the 9th day of March, 1943, and signed by the plaintiff, recorded in volume 164 of the conveyance records of Vermilion Parish on page 341 under entry number 78360 and recorded in volume 4 of the donation records at page 301 under entry number 78360, is annulled and ordered erased from the records of Vermilion Parish. The plaintiff is decreed the legally adopted child and forced heir of Mathilde Molaison, deceased, and declared to be the owner of an undivided one-third interest in the estate of the deceased. It is ordered that the legacies in the will of the deceased be reduced in accordance with the terms of the will so as to not encroach upon the plaintiff’s interest in the estate. All costs are to be paid by the succession.