178 So.2d 442 (1965)
Viola F. BERGERON, Plaintiff-Appellee,
v.
PORT ALLEN MORTUARY, INC., et al., Defendants-Appellants.
Jessie Lee MARSHALL et al., Plaintiffs-Appellees,
v.
The TRAVELERS INSURANCE COMPANY et al., Defendants-Appellants.
Nos. 6440, 6441.
Court of Appeal of Louisiana, First Circuit.
July 1, 1965.
Rehearing Denied September 27, 1965.
Writ Refused November 9, 1965.
*443 Tom F. Phillips, of Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for appellants.
Cashio & Mallory, Maringuoin, Edward Donald Moseley, of Benton & Moseley, Baton Rouge, Eric B. Settoon, New Roads, Strickland & Cole, Port Allen, A. Leon Hebert, Cobb & Brewer, Baton Rouge, for appellees.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
ELLIS, Judge.
These consolidated cases arise out of two separate automobile accidents which occurred on the night of November 9, 1958, on U. S. Highway 190 in West Baton Rouge Parish.
In the first of these suits Viola F. Bergeron is attempting to recover damages for the death of her husband, George Bergeron, and has joined as party defendants Port Allen Mortuary, Inc.; United Public Insurance Company (the insurer of Port Allen Mortuary, Inc.); Leon E. Jackson (the driver of the Port Allen Mortuary, Inc., ambulance); Hollabaugh-Spindle Mortuary, Inc.; The Travelers Insurance Company (the insurer of Hollabaugh-Spindle Mortuary, Inc.); and Jimmy W. Bowen (the driver of the Hollabaugh-Spindle Mortuary, Inc., ambuance). The trial court rendered judgment in favor of Viola F. Bergeron and against all defendants in solido except United Public Insurance Company in the amount of $10,000.00 plus legal interest and costs. All defendants except Port Allen Mortuary, Inc. and Leon E. Jackson have appealed and Viola F. Bergeron has answered the appeal seeking an increase in the judgment to $25,000.00.
In the second suit Jessie Lee Marshall, individually and as tutrix of Joseph B. Marshall, Eddie Lee Marshall, Stephen Marshall and Cleveland Marshall, is attempting to recover damages for the death of Flora Marshall, their mother. Also in this suit Inez Marshall is attempting to recover damages for the death of Flora Marshall and damages for personal injury to herself. Joined as defendants in this proceeding are Hall Davis (president and principal stockholder of Port Allen Mortuary, Inc.); Port Allen Mortuary, Inc.; United Public Insurance company; Leon E. Jackson; Hollabaugh-Spindle Mortuary, Inc.; The Travelers Insurance Company; and Jimmy W. Bowen. The trial court dismissed the suit insofar as Jessie Lee Marshall and Inez Marshall individually sought recovery for the death of their mother, but awarded judgment in solido against all defendants except Hall Davis and United Public Insurance Company, in favor of Joseph B. Marshall for $800.00 plus legal interest and costs; in favor of Eddie Lee Marshall for $1,400.00 plus legal *444 interest and costs; in favor of Stephen Marshall for $2,100.00 plus interest and costs; and in favor of Cleveland Marshall for $2,100.00 plus legal interest and costs. In addition, Inez Marshall recovered judgment in her favor for personal injuries for $15,677.50 plus legal interest and costs. This included $677.50 of special damages. All defendants except Port Allen Mortuary, Inc. and Leon E. Jackson have appealed. Plaintiffs did not answer the appeal.
During the course of the proceedings below, United Public Insurance Company was placed in conservation within the State of Louisiana and on January 30, 1961 a preliminary injunction was issued against all persons, enjoining them from bringing or further prosecuting any action against that insurer.
The night of November 9, 1958 was unquestionably very dark and Highway 190 was shrouded in a very dense fog which seriously impaired visibility. A Plymouth sedan traveling east at an approximate speed of fifty miles per hour and driven by Emile C. Chaney rammed the rear of a Ford station wagon being driven in the same direction at a somewhat lesser speed by Olaf England. Olaf England was alone. Flora Marshall was seated in the front of the Plymouth opposite Emile C. Chaney. Inez Marshall and George Bergeron shared the rear seat.
Considerable physical damage was sustained by both the Ford and Plymouth and Inez Marshall unquestionably received a foot injury in the initial encounter. Flora Marshall and George Bergeron were both rendered unconscious but the extent of the injuries they received in this encounter cannot be precisely established. The evidence does establish, however, that George Bergeron was alive following this accident because he was alive when he ultimately reached the hospital. It is possible that Flora Marshall might have been alive but the preponderance of the testimony is to the contrary. There is no doubt but that she was dead on arrival at the hospital.
Three ambulances responded to the emergency. These were the Port Allen Mortuary, Inc., ambulance driven by Leon E. Jackson; the Hollabaugh-Spindle Mortuary, Inc., ambulance driven by Jimmy W. Bowen; and an ambulance owned by Wilbert Service, Inc., and driven by Dudley Landry. Walter R. Wesley and Jeff Carpenter were riding as attendants in the Hollabaugh-Spindle and Wilbert Service ambulances respectively.
The Port Allen ambulance was the first to arrive at the scene of the accident. Inez Marshall, conscious though somewhat hysterical, got into the front seat opposite the driver. George Bergeron and Flora Marshall were placed on stretchers and loaded into the rear. Bergeron was on a cot which was fastened to the side of the ambulance. He was placed head toward front. Flora Marshall was on a smaller cot and there is testimony that she was lying head toward front of ambulance and some that she was placed in ambulance with head to the rear.
Highway 190 is a four-lane concrete artery running generally east and west. During the loading operation the Port Allen ambulance was parked in the extreme southern lane (an eastbound lane) facing west. Because of the traffic congestion and at the direction of the State Police officers on duty at the scene, it was necessary for the ambulance to proceed a short distance west in the eastbound lanes; to execute a "U" turn through a cut in the concrete neutral ground; to proceed east in the westbound lanes to a point east of the accident; and then to re-enter the eastbound lanes through a second cut. It was in this fashion that all eastbound traffic was being routed around the obstruction in the eastbound lanes.
Upon reaching the second cut, the Port Allen ambulance was unable to immediately return to the proper lane because a large truck was slowly executing that maneuver, the driver continued on rather than slowly follow the truck. Therefore, the Port Allen *445 ambulance continued east in the inside (southernmost) westbound lane. Jackson could have crossed the concrete neutral ground at any point and returned safely to the eastbound lanes.
At this point in time the Wilbert ambulance was traveling west in the outside (northernmost) westbound lane at an approximate speed of fifty miles per hour when it was overtaken and passed by the Hollabaugh-Spindle ambulance traveling west in the inside westbound lane at an approximate speed of sixty-five miles per hour. Shortly after this uneventful maneuver a head-on collision occurred between the Port Allen and Hollabaugh-Spindle ambulances in the inside westbound lane at a point 1584 feet from the initial accident.
The lower court concluded that the drivers of both ambulances involved in the crash were guilty of negligence proximately causing the accident. Leon E. Jackson was unquestionably negligent and nothing further need be said in that regard. Likewise, we agree with the lower court that Jimmy W. Bowen was negligent and that his negligence was a proximate cause of the accident.
Jimmy W. Bowen failed to keep a proper lookout. Dudley Landry testified that he was about 300 feet to the rear of Bowen and that he saw the lights of the approaching ambulance momentarily before the impact. No excuse has been advanced for Bowen's failure to observe the approaching Port Allen ambulance while it was still an equal distance from him. Walter R. Wesley, the attendant in the Hollabaugh-Spindle ambulance, testified that he yelled a warning to Bowen prior to the collision. Bowen testified that upon hearing this warning he looked to his left, believing that the danger was coming from that direction and, seeing nothing, he again looked ahead in time to see the Port Allen ambulance just before the impact. There is nothing to explain why Bowen did not observe the approaching vehicle at the same time Wesley did.
State Police officers testified that a speed of about thirty miles per hour would have been the maximum reasonable speed under the existing conditions. They did, however, drive fifty miles per hour to reach the scene of the initial impact. Landry was driving at that speed also and testified that he believed that to be risky. Therefore, by traveling at a speed of sixty-five miles per hour, Bowen was guilty of negligence by exceeding a reasonable and safe speed under the existing weather conditionsextreme limited vision because of the fog and this was a proximate cause of the accident.
R.S. 32:24 permits ambulances and other emergency vehicles to exceed the legal speed limit in all emergencies. However, that statute requires that the driver of the vehicle do so only "with due regard for the safety of all persons". This statute, which actually creates an immunity from criminal prosecution, cannot be invoked to absolve a driver of negligence merely because he is operating an emergency vehicle.
Appellant seeks to rely on the case of Jones v. Continental Casualty Co. of Chicago, Ill., La.App., 159 So.2d 5, and on the cases therein cited, as establishing that there is a presumption of negligence against a driver operating a vehicle in the wrong lane. This is certainly true. However, such a presumption does not preclude a consideration of contributory negligence on the part of the other driver.
Having established liability for the second accident, it is necessary to determine whether George Bergeron and/or Flora Marshall died as a result of injuries received in that accident, or in the initial collision. It is also necessary to determine what injuries Inez Marshall received in the second accident.
With reference to the death of Flora Marshall, we are impressed with the testimony of Dr. Chester Williams, coroner of the Parish of East Baton Rouge. Dr. *446 Williams testified that Flora Marshall died from a crushing injury to the chest and that this injury was more likely to have been received while she was riding in a sitting position, as in the first accident, rather than while she was lying on a stretcher in the rear of the ambulance, as in the second accident. Additional evidence bearing on this point is the fact that the rear interior of the Port Allen ambulance was basically undamaged after the second accident though there was considerable disarray and a "jumbled mass of bodies."
There is no convincing evidence that Flora Marshall was alive following the initial collision. Dr. Williams testified that if treatment is commenced soon after this type of injury the chances of recovery are good provided, of course, there are no other complicating internal injuries. No autopsy was performed in this case and therefore it is impossible to state with any certainty whether or not Flora Marshall could have been saved had she received immediate medical attention. Dr. Williams testified that it would be sheer speculation to guess one way or the other. In view of this we do not believe that the plaintiff has proven her case by a preponderance of the evidence. Inasmuch as the fatal injuries were received in the initial collision and because there is no convincing proof that Flora Marshall was alive following the receipt of those fatal injuries, recovery for her death must be denied.
George Bergeron died of a head wound which could have been received in either of the two accidents. Dr. Williams testified that with a wound of this nature there would be no chance of recovery though the patient could live for several hours, or even days. The evidence positively establishes that George Bergeron was alive when he arrived at the hospital but that he died shortly thereafter.
There was testimony to the effect that George Bergeron had some blood on his forehead following the initial accident. Leon Jackson testified that Bergeron did have a hole in his head and blood in his hair following the initial impact. Dr. Williams testified that with this type of injury there would have been profuse bleeding. The trial judge concluded from the evidence that George Bergeron received his fatal injury in the second accident. We cannot, however, agree with this. In our opinion, not only has the plaintiff failed to prove by a preponderance of the evidence that George Bergeron's injuries occurred in the second collision, but, on the contrary, the weight of the evidence establishes the converse to be the case. The outward physical condition and appearance of George Bergeron did not change from the time of the initial impact until his death in the hospital.
In the initial collision between the Plymouth automobile in which Bergeron was a guest passenger with the rear of the station wagon, the Plymouth struck with such force that the station wagon was badly damaged and was turned upside down. Bergeron after this terrific impact was on the floor between the front seat and the back seat and completely unconscious. He showed no signs of life although there is some testimony completely unworthy of belief to the contrary. He was laid upon the side of the road and blood wiped off of his forehead or face immediately after the accident. He was in this same condition when he was placed in the black Cadillac ambulance from Port Allen and he was apparently in the same condition after the second accident according to the testimony. Dr. Williams ascertained that he had sustained a fractured skull which rendered him unconscious and caused his death. We believe that it is established by the evidence that he had a "hole in his head" as a result of the first accident. Dr. Williams described it as a laceration on the head as the seat of the initial blow whereas the other witnesses described it as a hole in the head after the first accident and at the time he was placed in the ambulance. There is no testimony that there were *447 any additional injuries after the second accident. He was unconscious from the time of the first accident when he was taken out of the automobile and was unconscious when he was lowered into the ambulance and was unconscious when taken out of the ambulance and placed into another ambulance to continue the trip to the hospital and was unconscious when he arrived at the hospital, never regained consciousness, and died as a result of a fractured skull. While it is possible that he suffered some additional injuries in the second accident, based upon the testimony in the record and the full facts and circumstances, we are of the opinion that he received his fatal injuries as a result of the first accident.
There is no real dispute as to which injuries were received by Inez Marshall in the second accident. Following the initial impact the only injury apparent or complained of by Inez Marshall was an injury to her right foot. Following the initial impact she was walking around without any appreciable difficulty. After the second accident, however, Inez Marshall was found to have a fractured pelvis and numerous lacerations, contusions and bruises over her entire body and limbs. At the time of the trial of the case she had a severe depression of the head caused from a probable skull fracture and residual scars over numerous areas of her body. She also had a partial limp and complained of dizziness, headaches and periodic seizures. The medical evidence indicated that the depression in the skull could well be causing a pressure which in turn resulted in the seizures. However, there is no medical evidence that the head injury was actually received in the accident and Dr. Reiger who treated her had no record or recollection of any trouble or complaint in that regard.
The point of the depression is at the point of a scar which Dr. Reiger recalls having to suture. However, in view of the lack of medical evidence to establish a causal relationship between the injuries received in the accident and the head depression and seizures; and in view of claimant's failure to call this condition to the attention of her doctor until five years after the accident and then only at the courthouse on the day of the trial, we are unwilling to allow any damages for this item.
There is no doubt that Inez Marshall sustained severe and painful injuries in the second accident and that these injuries have lingered in the form of scars and a partial limp.
The case relied on by claimant to sustain an award of $15,000.00 plus special damages is Guarisco v. Swindle, La.App., 132 So.2d 635, in which this court approved an award of $12,500.00 for a fracture of the hip, minor lacerations of the knee and chin, general contusions and abrasions, and scars on the knee and chin. An examination of that case discloses, however, that surgery was performed on the hip, requiring sixteen days of hospitalization, a week of traction, and frequent shots for pain. The patient spent another week in bed at home, a month in a wheel chair, ten months with a walker, and a walking cane since. The injuries were complicated by diabetes, heart trouble and high blood pressure. The nail and screw inserted in the hip during surgery caused tenderness and pain, though the hip healed well. A twenty-five percent permanent disability of the leg followed the fracture.
The facts in the case at bar do not disclose injuries as severe as those in the Guarisco case. The official diagnosis was a "fracture of the pelvis, left side to body of ilium involving the acetabulum with displacement of the posterior acetabulum rim; multiple lacerations of face, and multiple contusions and abrasions about neck, and chest wall; laceration and contusions of the arms, hands, knees, and feet." Treatment consisted of suture repair to many of the cuts and twelve days of hospital bed rest. During half of this time claimant was upon crutches for short periods and was discharged *448 ambulatory with crutches. There was considerable pain. Dr. Reiger saw claimant only five or six times after she left the hospital, but would have recommended a few more visits. Under these facts, and considering that no surgery, permanent disability (other than a slight limp), prolonged immobility or complications were here involved as they were in the Guarisco case, we are of the opinion that an award of $8,500.00 will adequately compensate Inez Marshall for her injuries.
The final issue for determination by this court is the effect of a purported release executed by Viola Bergeron in favor of Port Allen Mortuary, Inc., and Leon Jackson on November 11, 1958, for $1.00 "and other good and valuable consideration."
The evidence establishes that Viola Bergeron went to the Port Allen Mortuary to make the necessary funeral arrangements. She had two policies of burial insurance with her and was unfamiliar with funeral arrangements or with insurance claims. Viola Bergeron testified that she signed what was presented to her and that no explanation was made regarding the nature of the various documents. She was unaware that she had signed a release until her attorney informed her.
Rowena Kador, who accompanied Viola Bergeron to the Port Allen Mortuary, and the two witnesses to the "release" testified that Viola Bergeron was very upset and disturbed, as was quite normal under the circumstances.
Just what the "other valuable consideration" for the release was is highly suspicious in view of the fact that Hall Davis insisted the value of the funeral given George Bergeron was about $1,100.00 and that he accepted a payment of $250.00 from the government. He refused, however, to state what the cost of the funeral was to him. Viola Bergeron had specifically requested a funeral not to exceed $640.00.
There is also evidence that Davis represented that the release would not affect her case, as he was covered by insurance.
We believe that the case of Wise v. Prescott, 244 La. 157, 151 So.2d 356, is dispositive of the issue involved here. In that case a release was signed through error, the party signing it believing that she was receiving a gift and further believing that it would have nothing to do with her case. In the instant case, the release was signed through error, the party signing it believing that she was signing papers necessary for the arrangement of the funeral. Under these circumstances, we have no hesitancy in holding that the release is of no effect, having been executed through error at a time when the claimant was upset and bereaved over the death of her husband.
In accordance with the foregoing opinion, the judgment of the lower court is reversed insofar as damages were allowed to Viola F. Bergeron and to Jessie Lee Marshall, individually and as tutrix for the minors, Joseph, Eddie Lee, Stephen and Cleveland Marshall, against all defendants except Port Allen Mortuary, Inc. and Leon Jackson for the deaths of George Bergeron and Flora Marshall, respectively. Judgments rendered below against Port Allen Mortuary, Inc. and Leon Jackson cannot be altered by this court as these defendants did not appeal. The judgment of the lower court with respect to the award in favor of Inez Marshall for bodily injuries is reduced from $15,000.00 to $8,500.00. Inez Marshall is not entitled to recover the sum of $677.50 representing special damages, this right of action belonging to the community and not to the wife.
Reversed in part and amended in part.