531 So.2d 768 (1988)
Larry M. HIGGINS
v.
John N. SPENCER and Sentry Insurance Company.
No. 87 CA 0030.
Court of Appeal of Louisiana, First Circuit.
February 23, 1988.
On Rehearing April 26, 1988.
Writ Denied September 23, 1988.
Caliste Beard, Jr. and Jed G. Gremillion, Beard, Artigue & Gremillion, Lafayette, for appellant.
David A. Hurlburt, Hurlburt, Privat & Monrose, Lafayette, for appellees.
Before WATKINS, CARTER and FOIL, JJ.
WATKINS, Judge.
Plaintiffs, Larry and Linda Higgins, appeal the trial court's dismissal on an exception of res judicata of their personal injury suit arising out of an automobile/bicycle accident.
The accident occurred on April 7, 1985 on Louisiana Highway 182 within St. Mary Parish. On May 1, 1985 the plaintiffs were paid the sum of $10,000 in settlement and compromise of all their claims against the defendants, John N. Spencer (Spencer) and his insurer Sentry Insurance Company (Sentry).
While acknowledging their signatures on the release and acknowledging receipt of the $10,000, the plaintiffs attack the validity of the settlement on the grounds that they lacked mental capacity (because of pain medication and low intelligence) at the time of the execution of the release.
The trial court concluded that the plaintiffs failed to prove lack of capacity and dismissed their suit. The record in this case reveals the following facts. On April 7, 1985 the plaintiffs were riding their bicycles in a westerly direction on Louisiana Highway 182 within St. Mary Parish, Louisiana, when Mr. Higgins collided with an automobile being driven by the defendant, John N. Spencer. Immediately following the accident *769 Mr. Higgins was hospitalized for approximately four days for head abrasions, a fractured left forearm, a fractured right ankle and a gross fracture of the left tibia and fibula. He underwent surgery on his left arm, to place steel plates on the fractures, and was then placed in three casts, one on each leg and one on his left arm. He was subsequently readmitted to the hospital on May 14, 1987 for an additional five days where a second surgery was performed on his arm after he stumbled while getting out of his wheelchair causing displacement of the steel plates.
Ms. Peggy Harmon, a claims adjuster representing Sentry, visited the plaintiffs about a week after Mr. Higgins returned home from his first hospital stay. Ms. Harmon took a statement from the plaintiffs and discussed a possible settlement. She returned to the Higgins' home on April 29, 1985 with an offer to settle any claims arising from the accident for $10,000. The plaintiffs, in the presence of Mrs. Higgins' sixteen-year-old cousin and grandmother, accepted the compromise and signed a release. Ms. Harmon, the cousin and the grandmother signed the release as witnesses. Approximately two days later a check for $10,000 was delivered to the plaintiffs and the check was subsequently cashed. The plaintiffs were not represented by an attorney during the settlement negotiations.
Ms. Harmon testified that she read the entire release to the plaintiffs, occasionally stopping to explain the terms and asking if they understood, to which they answered affirmatively. Ms. Harmon further testified that she had no reason to believe these people did not understand what was occurring even though she admitted being told by Linda Higgins that she was a mini-retard. Ms. Harmon stated that she explained that $10,000 was all they would receive and that they would be responsible for covering any bills out of that amount. Her testimony further indicated that when she brought the settlement check to the plaintiffs several days after they had signed the release, that plaintiffs told her they were planning on using the money to purchase some land and a trailer.
Plaintiffs testified that Ms. Harmon read the release and asked them if they understood it; they stated that Ms. Harmon did not explain the release to them prior to their signing it. It wasn't until after they signed that Ms. Harmon explained that they would be responsible for their own medical bills and replacement costs for Mr. Higgins' bicycle and glasses. The plaintiffs further testified that they understood at the time the release was signed that $10,000 was all the money they would receive, but believed that they would receive additional monies until Mr. Higgins recovered. He had been previously earning $80.00 per week doing lawncare work. Their testimony also indicated that they were under the impression that $10,000 was all that they were entitled to receive.
Mr. Higgins also testified that he was still on pain medication at the time he signed the release and that he "didn't know what was going on." Mrs. Higgins testified that she is illiterate and is classified as a "mini-retard" and receives Social Security benefits for her disability.
Dr. F.T. Friedberg, a psychologist, examined the plaintiffs and conducted various tests designed to evaluate their intelligence. After testing the plaintiffs he concluded that the plaintiffs could not understand the release if it had simply been read to them. However, he stated that if the release had been explained to the plaintiffs, they could have understood its import. He went on to state that the explanation would have to be in very simplistic terms, pointing out in detail the fact that the plaintiffs would be responsible for paying all of their medical bills, past and future, living expenses while unemployed, and replacement costs for Mr. Higgins' bicycle and glasses which were damaged in the accident, etc., if the plaintiffs were to understand.
The testing performed by Dr. Friedburg revealed that Larry Higgins functions intellectually at approximately the lower 5% of the population, with word recognition at a third grade level, and that Linda Higgins functions at approximately the lower 1% of *770 the population. Dr. Friedburg also stated that Larry Higgins possessed deficits in immediate memory and difficulties in abstract thinking. It was also the doctor's opinion that Larry Higgins had very few emotional, cultural or intellectual assets with which to make reasonable judgments about things like monetary remuneration involving injuries.
Based on the above facts the plaintiffs contend that Mr. Higgins' low intelligence and the fact that he was taking pain medication deprived him of reason at the time he signed the release. Furthermore, the plaintiffs contend that Mrs. Higgins' mental disability and her inability to read or write established that she was incapable of entering into a contract of this nature.
The courts have recognized three different legal theories in which a person may have a contract annulled for lack of mental capacity or reasoning ability at the time the contract was executed. We will explore each theory and its applicability to the facts in the present case.
The first theory is lack of legal capacity to contract. The Civil Code provides that a compromise is a form of contract and has a force equal to the authority of the thing adjudged. LSA-C.C. art. 3078. Ditch v. Finkelstein, 399 So.2d 1216 (La. App. 1st Cir.1981). Furthermore, "The law encourages the settlement of disputes by compromise, and such settlements should not be rescinded lightly." Durbin v. Cockerham, 442 So.2d 634, 636 (La.App. 1st Cir.1983). However, under the law of obligations, four elements are required for confection of a valid contract: (1) the parties must possess the capacity to contract; (2) the parties' mutual consent must be freely given; (3) there must be a certain object for the contract; and (4) the contract must have a lawful purpose. LSA-C.C. arts. 1918, 1927, 1966, 1971; First National Bank of Shreveport v. Williams, 346 So.2d 257 (La.App. 3d Cir.1977).
In the absence of a special exception, a presumption arises that all persons possess the capacity to contract. The exceptions to the presumption of capacity must be shown quite convincingly and by the great weight of the evidence. Meadors v. Pacific International Petroleum, Inc., 449 So.2d 26, (La.App. 1st Cir.1984), writ denied, 450 So.2d 964 (La.1984). The exceptions to the presumption of the capacity to contract are enumerated in LSA-C.C. art. 1918 as follows:
All persons have capacity to contract, except unemancipated minors, interdicts, and persons deprived of reason at the time of contracting.[1]
Furthermore, LSA-C.C. art. 1925 provides that:
A noninterdicted person, who was deprived of reason at the time of contracting, may obtain rescission of an onerous contract upon the ground of incapacity only upon showing that the other party knew or should have known that person's incapacity.[2]
We find only two decisions involving a mentally retarded person seeking to annul a contract based on lack of capacity.[3]Coburn *771 Finance Corporation v. Bennett, 241 So.2d 802 (La.App. 3rd Cir.1970); Stevenson v. Beneficial Finance Co. of Hammond, 295 So.2d 880 (La.App. 1st Cir.1974). Coburn involved a promissory note executed by a 22-year-old mental retardate. The court, applying prior civil code art. 1788,[4] chose to ignore the fact that the defendant had never been interdicted and instead based its decision on the fact that the defendant was mentally retarded, unable to read or write and that the defendant's employer told the plaintiff that defendant had the mentality of a 5 or 6 year old child. Obviously the court saw a need to release a person from a contract, who, although able to function without being interdicted, did not have the mental capacity to contract. The Stevenson case involved a mentally retarded plaintiff attempting to annul a default judgment rendered against him under the provisions of Code of Civil Procedure article 2002(1).[5] The plaintiff contended that he was so severely mentally retarded that he was incompetent within the meaning of art. 2002(1). The evidence of incompetency consisted of testimony of his attorney and a letter report from a clinical psychologist which classified the plaintiff as a mildly retarded individual.
The default judgment was obtained after the plaintiff defaulted on several promissory notes arising from purchases of six televisions and several stereos and radios. The court stated that the plaintiff was obviously abnormal and had been taken advantage of.
The court found the evidence insufficient to prove that the plaintiff was incompetent and refused to apply LSA-C.C. art. 1788 because the plaintiff was not interdicted.
The facts in the present case show that Ms. Harmon was aware that Linda Higgins was classified as a mini-retard and was illiterate. However, we do not find sufficient evidence to establish that Ms. Harmon knew or should have known that Larry Higgins, either because of his low intelligence or because of pain medication, was "deprived of reason" at the time he executed the release.
The second legal theory relied on to annul a contract due to lack of capacity was announced by the Supreme Court in Succession of Molaison, 213 La. 378, 34 So.2d 897 (La.1948).[6] In Molaison the plaintiff, an adopted daughter and forced heir to the testatrix, had been induced by the residuary legatee-executrix of the estate and certain former business associates of the testatrix to renounce her claim to one-third of the $225,000 estate for a $5,000 legacy which the testatrix had instructed *772 the plaintiff to expect. The plaintiff was 52 years old and living on welfare and suffering from an advanced stage of diabetes and a highly inflamed knee. Although the plaintiff was educated, she was described intellectually as not very bright and unfamiliar with business and legal affairs. The court annulled the renunciation, stating the following equitable doctrine:
Where parties of somewhat equal experience and mental capacity enter into an engagement, the courts are reluctant to disturb it unless there is fraud. However, it is the duty of the courts to carefully and painstakingly investigate the circumstances surrounding transactions between a person of limited mental capacity and one experienced in business affairs, in order that substantial justice might be meted out.
Id. 34 So.2d at 903.
The facts in the present case, although somewhat distinguishable from those in Molaison, smack with the same inequities dealt with in Molaison. The plaintiffs are obviously persons of limited mental capacity and without experience in business affairs. The insurance adjuster with whom they contracted the settlement was obviously very experienced in business affairs and clearly maintained a superior bargaining position to that of the plaintiffs.
The third legal theory upon which the courts have relied to annul contracts (specifically release contracts) is found in the civil code articles dealing with transactions and compromise. The following articles establish the basis of this theory:
Art. 3073. Transactions regulate only the differences which appear clearly to be comprehended in them by the intention of the parties, whether it be explained in a general or particular manner, unless it be the necessary consequence of what is expressed; and they do not extend to differences which the parties never intended to include in them.
The renunciation, which is made therein to all rights, claims and pretensions, extends only to what relates to the differences on which the transaction arises.
Art. 3078. Transactions have, between the interested parties, a force equal to the authority of things adjudged. They can not be attacked on account of any error in law or any lesion. But an error in calculation may always be corrected.
Art. 3079. A transaction may be rescinded notwithstanding, whenever there exists an error in the person or on the matter in dispute. It may likewise be rescinded in the cases where there exists fraud or violence.
The provisions in arts. 3073 and 3079 allowing recission of a transaction or compromise have been relied on in two different fact situations. First, the courts have allowed recission based on art. 3079 where the releasors were mistaken as to what they were signing, even though fraud was not present. Wise v. Prescott, 244 La. 356, 151 So.2d 356 (La.1963); Bergeron v. Port Allen Mortuary, Inc., 248 La. 441, 443, 178 So.2d 442 (La.App. 1st Cir.1965), writ denied, 248 La. 441, 179 So.2d 430 (La.1965); Moak v. American Automobile Insurance Company, 242 La. 160, 134 So.2d 911 (La. 1961). Secondly, the courts have allowed recission based on articles 3073 and 3079 in situations where the releasor did not fully understand the nature of the rights being released, or where the releasor did not intend to release certain aspects of his claim. Moak, supra; Cooperider v. Dearth, 420 So.2d 220 (La.App. 4th Cir.1982); Henderson v. Stansbury, 372 So.2d 1253 (La.App. 3rd Cir.1979); Mooneyhan v. State Farm Mutual Automobile Ins. Co., 290 So.2d 405 (La.App. 2d Cir.1974); Lowery v. Anderson, 265 So.2d 644 (La.App. 2d Cir.1972); Harris v. Stockman, 197 So.2d 365 (La.App. 2d Cir.1967); Wyatt v. Maryland Casualty Company, 160 So.2d 383 (La.App. 2d Cir.1964); Miller v. Judice, 149 So.2d 715 (La.App. 4th Cir.1963); McDaniel v. Audubon Insurance Company, 121 So.2d 531 (La.App. 1st Cir.1960).
In Lowery, the plaintiff, who was an elderly woman with only a third grade education and little ability to read or write, signed a release in respect to injuries sustained by her minor grandson in a motorcycle accident. The court found that the plaintiff did not understand what she was *773 asked to sign, and that the release was not read to her. The court stated that:
Under the provisions of La.Civ.Code Article 3079 a transaction may be rescinded when there exists an error on the matter in dispute. Error has been found sufficient to allow the rescission of a release when the party at whose insistence the release was obtained has an undue advantage over the releasing party who does not fully understand the nature of the rights being released. Harris v. Stockman, 197 So.2d 365 (La. App. 2d Cir.1967) ...
As pointed out in the Harris case, it is not necessary to show fraud or misrepresentation to rescind a release, nor do we have these elements involved here. The evidence does show that Sallie Lowery did not understand her rights at the time she signed the release, nor was she sufficiently informed of what she was signing, or the real purpose therefor. Id. at 648.
The facts of the present case are particularly applicable to the theory enunciated in the Lowery decision and in view of Dr. Friedberg's testimony, and in light of human experience we are convinced that the plaintiffs did not sufficiently understand the nature of the rights which they gave up in consideration for $10,000. Equally evident is the great disparity of bargaining positions between the plaintiffs and the insurance company.
For the reasons hereinabove stated, the judgment sustaining the plea of res judicata filed by defendants, John N. Spencer and Sentry Insurance Company, and dismissing the demands of plaintiffs, Larry and Linda Higgins, is reversed at defendants' cost. We remand for further proceedings.
REVERSED AND REMANDED.
CARTER, J., concurs.

ON REHEARING
PER CURIAM.
In this petition for rehearing applicants point out that we did not address in our original opinion the matter of the return of the consideration received by plaintiffs for the release. Since our decision had the effect of rescinding the contract of settlement of the claim between plaintiffs and defendants, the defendants are entitled to a return of the consideration paid to plaintiffs. LSA-C.C. art. 1921.
NOTES
[1] The comments following LSA-C.C. art. 1918 state that, "[t]he expression `persons deprived of reason' is designed to include all of the varieties of derangement that have been acknowledged by the Louisiana jurisprudence."
[2] Comment (b) of LSA-C.C. art. 1925 provides:

(b) Under this Article, rescisson of an onerous contract entered into by a person deprived of reason who was not interdicted at the time of contracting can only be obtained upon a showing that the capable person knew or reasonably should have known that he was dealing with a person deprived of reason. Proof that the alleged incapable was "notoriously insane" at the time of contracting raises a rebuttable presumption that the other party knew that he was contracting with a person deprived of reason.
[3] The majority of decisions based on present Civil Code arts. 1918 and 1925 and previous Civil Code art. 1788 deal with fact situations wherein the plaintiff suffered a temporary mental incapacity although of average or above average intelligence either because of drug use. First State Bank & Trust Co. v. Seven Gables, Inc., 501 So.2d 280 (La.App. 1st Cir.1986), writ denied, 502 So.2d 103 (La.1987); Meadors, supra; Kleiner v. Ciko, 417 So.2d 54 (La.App. 1st Cir.1982), writ denied, 420 So.2d 457 (La. 1982); psychiatric disabilities, First National Bank of Shreveport v. Williams, supra; physical illness, Mashia v. Pollard, 442 So.2d 1249 (La.App. 5th Cir.1983), writ denied, 445 So.2d 438 (La.1984); or advanced age, Kennedy v. Bearden, 471 So.2d 871 (La.App. 2d Cir.1985).
[4] Prior to the revision of the law of obligations in 1985, the code provided two ways in which a person could show incapacity. LSA-C.C. art. 1788 required that a person claiming to be insane at the time of contracting be interdicted as prima facie proof of his incapacity and LSA-C. C. art. 1789 required that the party claiming to be temporarily deranged prove the derangement at the time of executing the contract and that his incapacity was apparent.

Article 1788 was not included in the obligations revision, however the comments to article 1918 seem to indicate that the jurisprudence which developed under article 1788 should be used as a guideline in defining the term "deprived of reason." Although art. 1788 used the term "insanity", the courts interpreted that term to include a variety of mental and physical conditions, such as habitual insanity, Gipson v. Spearman, 186 La. 18, 171 So. 558 (La.1936); mental retardation, Coburn Finance Corp. v. Bennett, supra; drug sedation, Brumfield v. Paul, 145 So.2d 46 (La.App. 4th Cir.1962); drunken stupor, Emerson v. Shirley, 191 La. 741, 186 So. 88 (La.1938); and the toxic effects of disease, Succession of Schmidt, 219 La. 675, 53 So.2d 834 (La.1951). See also Footnote 3 infra.
[5] LSA-C.C.P. art. 2002 provides in pertinent part:

A final judgment shall be annulled if it is rendered:
(1) Against an incompetent person not represented as required by law;
[6] We note that the Molaison decision was factually distinguished by this circuit in Banks v. Johns, 289 So.2d 194 (La.App. 1st Cir.1973), where the heirs of a vendor suffering from chronic brain syndrome attempted to rescind a sale of property. We concluded that article 1788 did not apply because the vendor had never been interdicted and that article 1789 did not apply because his incapacity was not apparent.