346 So.2d 257 (1977)
FIRST NATIONAL BANK OF SHREVEPORT, Plaintiff-Appellee,
v.
James Henry WILLIAMS, Defendant-Appellant.
No. 5939.
Court of Appeal of Louisiana, Third Circuit.
May 13, 1977.
*258 Watson, Murchison, Crews & Arthur, by Daniel T. Murchison, John G. Williams, Natchitoches, for defendant-appellant.
Gahagan & Gahagan by H. C. Gahagan, Jr., Natchitoches, for defendant-appellee, Harry Friedman, Jr.
Blanchard, Walker, O'Quin & Roberts by Neilson S. Jacobs, Shreveport, for plaintiffappellee.
Before WATSON, FORET and HEARD, JJ.
FORET, Judge.
This appeal arises from the consolidation of two cases,[1] the first of which judgment was rendered in favor of plaintiff, First *259 National Bank of Shreveport (hereinafter referred to as First National) against James Henry Williams upon a promissory note dated January 8, 1975, and the second of which judgment was rendered against the plaintiff, James Henry Williams, and in favor of defendant, Harry Friedman, Jr. In the first suit, appellant Williams asserted the affirmative defenses of lack of consent due to error in fact, lack of agreement on the subject matter of the sale, invalidity of the note on grounds of lack of capacity to contract due to a temporary derangement of intellect as a result of disease, lack of a negative (contravention of prohibitory law) brucellosis test regarding a herd of cattle, and lack of a plaintiff holder in due course. In the second suit, these affirmative defenses were the causes of action brought by Williams in an attempt to seek a declaration that the sale and promissory note dated January 8, 1975, were null and void.
On or about December 14, 1974, James Henry Williams, a/k/a J. H. Williams, and Harry Friedman, Jr., began negotiations for Mr. Williams to purchase the cattle of Mr. Friedman as well as certain agricultural implements and to lease lands upon which Mr. Friedman was grazing his herd of cattle. These negotiations continued with the two parties meeting each other on occasions and with certain agents and employees of Mr. Williams, particularly his son-in-law, Ralph Ingram, Jr., consulting with Harry Friedman, Jr. On or about January 4, 1975, Bruce Champion and four other employees or agents of Mr. Williams began counting, inventorying, and appraising the cattle and equipment belonging to Friedman. This series of negotiations and appraisals culminated in a sale of the cattle and equipment and the execution of a promissory note in the law office of Sam Friedman, a first cousin of Harry Friedman, Jr., in Natchitoches, Louisiana, on January 8, 1975. On January 16, 1975, J. H. Williams was forcibly committed to Brentwood Hospital in Shreveport, Louisiana, to be treated for a mental condition subsequently diagnosed as "manic-depression". J. H. Williams remained hospitalized until February 22, 1975.
On or about January 10, 1975, employees of J. H. Williams took possession of the cattle and equipment formerly belonging to Harry Friedman, Jr. Possession was maintained until on or about March 12, 1975, when Williams advised Friedman that the cattle were going to be returned.
The consideration of the sale from Friedman to Williams was a promissory note dated January 8, 1975, and due on February 15, 1975. Approximately two days prior to the commitment of J. H. Williams to Brentwood Hospital, Harry Friedman, Jr. physically delivered and pledged the note to the First National Bank of Shreveport. On January 27, 1975, Ralph C. Ingram, Jr., son-in-law of J. H. Williams and manager of his extensive farming and agricultural operations, executed a letter purporting to confirm, ratify and recognize the validity of the sale of the cattle and equipment in return for an extension of the due date of the promissory note which was the consideration for the sale on January 8, 1975. Mr. Ingram was the duly appointed agent and attorney-in-fact for J. H. Williams by virtue of an Act of Procuration of record in the Clerk's Office in Natchitoches Parish.
Approximately two and one-half weeks after his return from the Brentwood Hospital, J. H. Williams denied liability to a representative of the First National Bank of Shreveport on the January 8, 1975 promissory note in the sum of Two Hundred Forty-Three Thousand, Seven Hundred Fifty and No/100 ($243,750.00) Dollars. The First National Bank then sued J. H. Williams. Mr. Williams answered contending that the note was null and void on the basis of temporary insanity at the time the note was executed; that the sale of cattle and other items for which the note was given was null and void because it was made without a valid thirty-day negative brucellosis test certificate; and, that the plaintiff, First National Bank of Shreveport, was not a holder in due course of the note.
Harry Friedman, Jr., who had originally pledged the note to the First National Bank of Shreveport, was made a third party defendant in the action filed by the Bank. *260 Immediately after the suit filed by the First National Bank, J. H. Williams brought suit against Harry Friedman, Jr. seeking to have the sale of the cattle and resulting note declared null and void and the lease of lands cancelled. The two suits were consolidated for trial.
From judgment rendered in favor of the First National Bank of Shreveport and Harry Friedman, Jr. rendered September 20, 1976, signed September 27, 1976, J. H. Williams perfected this appeal. Harry Friedman, Jr. answered the appeal of J. H. Williams requesting that certain items of expense for the care and maintenance of the cattle subsequent to March 12, 1975, be increased.
In his appeal, appellant, J. H. Williams, assigned as issues to be resolved in this Court, the following, to-wit:
1. Was the sale of January 8, 1975, invalid because of any or all of the following alternative reasons, to-wit:
a. Want of legal capacity on the part of Mr. Williams to enter into a contract by reason of temporary insanity;
b. Consent was lacking by reason of error in fact;
c. There was no agreement on the subject of the sale;
d. The sale was made in contravention of prohibitory law;
e. The sale was voidable on the grounds of breach of warranty;
2. Is the First National Bank of Shreveport a holder in due course, and are the defenses against Harry Friedman, Jr., enumerated above, equally applicable to the Bank in connection with its suit on the note, which note was given in consideration of the sale?
3. Was the action of the First National Bank of Shreveport in filing its suit on the note premature, and if so, should the suit on the note be dismissed because of the prematurity?
For the making of any valid contract, four (4) elements are absolutely required:[2]
(1) Parties possessing the capacity to contract;
(2) Mutual consent freely given thereto;
(3) A certain object;
(4) A lawful purpose.
As to the first element, that is, capacity to contract, in the absence of a special exception, a presumption arises that all persons possess that capacity. C.C.Art. 1782.
In this case, it is contended that J. H. Williams, on the 8th day of January, 1975, because of unsound mind, did not possess the capacity to contract. This exception to the presumption of capacity to contract is specifically enumerated in the Louisiana Civil Code, which provides:
"Art. 1788 The contract, entered into by a person of insane mind, is void as to him for the want of that consent, which none but persons in possession of their mental faculties can give. It is not the judgment of interdiction, therefore, that creates the incapacity; it is evidence only of its existence, but it is conclusive evidence, and from these principles result the following rules:
"`. . . (2) As to contracts, made prior to the application for the interdiction, they can only be invalidated by proving the incapacity to have existed at the time the contracts were made.
'(3) But in order to prevent imposition, it is not enough to make the proof mentioned in the last rule; it must also, in that case, be shown that the person interdicted was known by those who generally saw and conversed with him, to be in a state of mental derangement, or that the person who contracted with him, from that or other circumstances, was acquainted with his incapacity.'"
"Art. 1789 A temporary derangement of intellect, whether arising from disease, accident, or other cause, also creates an incapacity pending its duration, provided the situation of the party and his incapacity were apparent."
The provisions of Civil Code Article 1788 do not apply to the case at bar. In this *261 case, in which a living person directly attacks the validity of a contract to which he is a party on the ground of lack of capacity due to a mental condition, in order for Article 1788 to apply, proceedings for an interdiction of that party must have commenced, and that party must be insane. Coburn Finance Corp. v. Bennett, 241 So.2d 802 (La.App. 3 Cir. 1970); Ponder v. Pechon, 274 So.2d 386 (La.1973). In this case, no judgment of interdiction has been rendered and no proceedings for the interdiction of J. H. Williams have been filed; no allegation has been made, and no evidence has been admitted, that J. H. Williams, on January 8, 1975, did "not enjoy the exercise and use of reason . . . . C.C.Art. 31.
The provisions of Civil Code Article 1789 do, however, apply to the very factual situation of this case. No interdiction proceedings have been instituted; Williams alleges that, as a result of a temporary derangement of his intellect as a result of a disease psychosis, manic depressive, manic stage as of the date of the execution of the sales contract and the promissory note, which mental derangement was generally known or known to Harry Friedman, Jr., the other contracting party, he lacked the capacity to contract. Vance v. Ellerbe, 150 La. 388, 90 So. 735 (1922); Banks v. Johns, 289 So.2d 194 (La.App. 1 Cir. 1973); Brumfield v. Paul, 145 So.2d 46 (La.App. 4 Cir. 1962); Smith v. Blum, 143 So.2d 419 (La. App. 4 Cir. 1962).
The jurisprudence of this State in relation to Civil Code Article 1789 is somewhat old and few in number. In the case of Coburn v. Bennett, supra, the defendant could neither read nor write, and had the mentality of a five or six-year-old. The other party was notified of defendant's mental age and defendant's speech showed signs of the mental deficiency. In such case, this Court ruled that the defendant suffered a temporary derangement of intellect as a result of disease or accident, and that the other contracting party was cognizant of that fact. In the case of Banks v. Johns, supra, the heirs of the vendor attempted to rescind a sale on the grounds of the mental incompetence of the vendor. Three days prior to the sale, Banks, vendor, had shot his wife. On the following day, Banks was admitted to East Louisiana State Hospital, and his condition was diagnosed as chronic brain syndrome associated with cerebral arteriosclerosis, with psychotic episodes. On trial of the matter, a physician testified that Banks knew that which he was doing on the date of the sale, and that Banks showed no signs of psychosis at the time of admission to the hospital. The purchaser, a witness to the sale, and the notary before whom the sale was passed testified that Banks seemed to have understood that which he was doing and looked no different than he did before. The First Circuit ruled that the evidence did not preponderate to the effect that the situation of the party and his incapacity were apparent to the other contracting party or to the general public.
In the case of Brumfield v. Paul, supra, a contract was declared to be null and void upon the grounds of the mental incompetence of one of the parties thereto. It was shown, by a preponderance of the evidence, that at the inception of the sales contract, the plaintiff was receiving medication, was under heavy sedation, and was irrational and therefore incapable of making any decision or transferring of property.
In the Succession of Schmidt, 219 La. 675, 53 So.2d 834 (1951), the heirs of a testatrix attacked the validity of her olographic will. The evidence presented established that the testatrix suffered from toxic psychosis, which disease causes the person suffering therefrom to undergo periods of exacerbation and remission of irrationality and lucidity. The court ruled that this was a case to be determined according to C. C. Article 1789. Because the disease admitted of rational periods and evidence was presented that the testatrix did in fact have rational periods, the Court ruled that the presumption that the testatrix wrote the will during one of her lucid rational periods existed, and the plaintiffs did not bear their burden of proving that such was not the case.
*262 We have reviewed several decisions of other jurisdictions to determine exactly what test or tests are used to determine whether or not, at the inception of the contract, the parties thereto have the mental capacity to contract. According to the case of Ebrite v. Brookhyser, 219 Ark. 676, 244 S.W.2d 625, 44 A.L.R.2d 587 (1951) if the maker of a deed has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, to comprehend how he is disposing of it and to whom and upon what consideration, then he possesses sufficient mental capacity to execute such instrument. If a person has such mental capacity, then, in the absence of fraud, duress, or undue influence, mental weakness, whether produced by old age or through physical infirmity, will not invalidate an instrument executed by him.
In the case of Buuck v. Kruckeberg, 121 Ind.App. 262, 95 N.E.2d 304, 22 A.L.R.2d 1145 (1950), the test of mental capacity to make a deed is that the parties thereto shall have sufficient mind and memory to comprehend the nature and extent of their acts, to understand the nature of the business in which they are engaged, and to exercise their own will in reference thereto. In Tate v. Murphy, 202 Okl. 671, 217 P.2d 177, 18 A.L.R.2d 892 (1949), it was ruled that evidence of the mental condition or capacity of a contracting party at the time of the execution of the contract was controlling over evidence of the mental capacity of such party before and after the act. The finding of the trial court that a party was incompetent at the time of a transfer was against the clear weight of evidence where, despite evidence of instances indicating failing memory, a failing sense of direction, hallucinations, susceptibility of being influenced, and inclination to a change of mind, while the contracting party was under the influence of sedatives, there was undisputed evidence that at other times the contracting party knew what he was doing, and was fully able to understand the effect of his deed, and all the witnesses who saw him on the date of the transfer testified that he was mentally competent at that time.
During trial, the following medical doctorsN. J. Bender, James Kaufman, Charles E. Cook, and William A. McBride, Jr. testified concerning the mental condition of J. H. Williams prior and subsequent to January 8, 1975, the date of the execution of the contract for the rescission of which Williams brought suit. All of the doctors agree that J. H. Williams suffered from manic depressive psychosis as of January 16, 1975.
Dr. N. J. Bender, psychiatrist, examined and treated J. H. Williams but once prior to January 8, 1975. That occasion was at Schumpert Hospital, Shreveport, Louisiana, on July 22, 1974, at which time Bender diagnosed Williams' condition as depressive neurosis, a relatively mild illness of which the principal symptoms are alternating periods of anxiety and depression, the latter of which is of a more frequent nature. Dr. Bender's next treatment of Williams occurred on January 16, 1975, at which time Bender diagnosed Williams' mental condition as psychosis, manic depressive, manic stage, a severe mental illness involving a change in the patient's total personality and in the patient's ability to test reality.
As to a guide to a better understanding of the manic depressive psychosis illness, Dr. Bender enumerated the following stages through which the patient passes: (1) hypomania; (2) mania; (3) manic delirium, and stated that there is no such thing as a lucid interval (a full return of the mind to sanity see Succession of Tyler, 193 La. 480, 190 So. 651 (1939)) for one suffering from manic depressive psychosis. Dr. Bender stated that Williams' July, 1974 depressive neurosis was but the beginning of that which finally culminated in the manic depressive psychotic illness and that in November and December, 1974, during the time in which Williams passed through the hypomania stage, his judgment was impaired.
Dr. Bender, however, greatly confused this reader when he stated that one suffering from manic depressive psychosis can talk, operate a motor vehicle, write, dress *263 himself, show affection, and boast, as well as any normal person; that although that person will have impaired judgment, he may know what he is doing; that Williams always exhibited a cyclothymic personality, one in which the person alternately experiences more elation and more depression than the normal individual and exhibits the same traits as does one under the hypomania stage; and that a lay person probably could not distinguish between hypomanic symptoms and the normal actions of an extrovert loud and/or rapid rate of speech; indulgence in theatrical behavior; domination of conversation; lack of concentration for an extended period of time.
Dr. James Kaufman, general practitioner and assistant coroner for the Parish of Natchitoches, the family physician of the Williams family, treated and examined Williams in July, 1974, at which time clinical examination revealed that Williams suffered from marked mental depression, and on December 10, 1974, at which time Williams was very hyperactive, agitated, and belligerent. Although he merely conversed with Williams on December 19, 1974, and gave no psychological evaluations and/or tests, Dr. Kaufman concluded that, at that time, Williams was within the manic stage of his psychotic illness.
Dr. Charles E. Cook, general practitioner and Coroner of Natchitoches Parish, concluded, upon the basis of conversations and meetings with Williams, that the latter was sane and acted within the normal range of his extroverted and outgoing personality as of December 25, 1974. Dr. Cook's first clinical examination of Williams was dated January 16, 1975, at which time he made preparations for Williams' confinement to Brentwood Hospital in Shreveport, Louisiana.
Dr. William A. McBride, Jr., psychiatrist, never examined and/or treated J. H. Williams. His testimony concerned the nature and extent of psychotic mental illness, the detection of same, and the nature and extent of the cyclothymic personality. According to this expert in the mental field of medicine, manic depressive psychosis is an abnormal change in the individual's total personality, in which the individual loses control with reality and his ability to function in reality. The individual normally undergoes these phases of the illness: (1) depression; (2) mania; (3) manic delirium, which phases may, or may not, be progressive, depending upon the state of the individual, the degree of stress, and the degree of exhaustion of the individual. Dr. McBride stated that the illness is characteristically cyclical without deterioration and that there is a high rate of recurrence depression, mania, manic delirium, normalcy; in the intervals between such episodes, the individual usually is clearheaded, can function very effectively in society, "and for all intents and purposes he is normal as everybody else", (emphasis provided)
Dr. McBride opined that manic depressive psychosis can only be diagnosed at the point at which the individual passes through the manic delirium stage and is very belligerent. He further stated that the probability of detection by a lay person of a cyclothymic personality with that mental condition would be quite difficult.
Dr. McBride definitely stated that hypomania was not considered a psychotic illness, but rather was listed in the nonpsychotic disorders and in relation to the cyclothymic personality. He stated that the cyclothymic personality was within the range of normalcy and was between the normal and the psychotic. According to the Doctor, hypomanic behavior is usual of an energetic, aggressive person not in conflict with society, and not exhibiting irrational behavior.
From his review of the records of Brentwood Hospital, the report and testimony of Dr. Bender, and a narrative of the personality of J. H. Williams, Dr. McBride agreed with Dr. Bender's diagnosis of January 16, 1975, but concluded that Williams exhibited hypomanic behavior until January 12, 1975, the date of commencement of the manic phase of the psychotic illness.
A large number of lay witnesses testified as to the general reputation of Williams within the Natchitoches community. Although *264 most stated that the rumors concerning Williams related largely to the number and profitability of the transactions undertaken by Williams, and although a great majority of those transacted business with Williams, they opined that in the latter part of 1974 and the early part of 1975, Williams suffered from a deteriorated mental condition.
Three lay witnesses James Stacy, Harry Friedman, Jr., and Sam Friedman testified as to Williams' conduct and behavior on January 8, 1975. Stacy stated that Williams acted as if he understood the provisions of the lease as between the two of them. Harry Friedman opined that Williams was fully cognizant of their contract of sale and viewed the list of equipment and cattle that were the object of the sale; and stated that when disagreement as to the sales price arose as between the two of them (each had an appraisal of the worth of the cattle), they arrived at a sales price by splitting the difference of the two appraisals. Sam Friedman (a prominent Natchitoches attorney), the notary public who executed the Stacy lease and the Friedman sale, stated that Williams gave the impression that he understood the provisions of the two contracts, and that had Williams not done so, he, Friedman, would not have completed the execution of the contracts.
The law of this State presumes the capacity to contract and favors and promotes that freedom. But very few exceptions exist as to this presumed capacity to contract, which exceptions must be shown quite convincingly and by the great weight of the evidence. Where doubt exists as to the showing of an exception, the presumed capacity to contract prevails. In a case such as this, in which the experts differ in their opinions as to the effect of the disease as regards the ability to understand and reason; evidence, although controverted, is presented to establish periods of sanity, of lucidity, for a person suffering from the disease; and unrefuted testimony is presented that the person so suffering exhibited reason and understanding of the contract sought to be rescinded, doubt exists as to the weight of evidence in favor of an exception, and the presumption of the capacity to contract remains.
The evidence presented in this case satisfied the trial court and satisfies this Court that Williams freely and legally consented to the sales contract with Friedman that he understood the obligation(s) to which he was bound, and the number, amount, and value of the equipment and cattle which he purchased. Therefore, we conclude that appellant's argument as to lack of consent and of agreement on the subject of the sale are not meritorious.
Evidence was presented that the sales contract was executed in contravention of prohibitory law no test for brucellosis was conducted within thirty (30) days of the sale. However, nothing was before the trial court which revealed bad faith, moral turpitude and/or that the contract was against public morals. For such reasons, we hold, as did the trial court, that the sales contract cannot be rescinded. Post Office Employees Credit Union v. Frosina, 77 So.2d 213 (Orl.La.App.1955); Fix-It Shop v. Roy, 68 So.2d 332 (Orl.La.App.1953).
For the above reasons and rulings, the issue as to whether or not the First National Bank of Shreveport was a holder in due course is pretermitted.
Prior to trial, appellant filed an Exception of Prematurity. On trial of the matter appellant, Williams, testified that Ralph Ingram, his manager, had no authority to extend the date upon which the note was to mature, and thus contradicted the basis of his exception. For that reason the trial court properly overruled the exception.
Appellee in our Number 5940, entitled "James Henry Williams v. Harry Friedman, Jr.", has answered the Williams appeal, urging that we sustain other portions of the judgment rendered in the trial court, but amend same in the following respects:
1. Increase the trial court's award of $26,686.86, to $47,843.17 together with legal interest thereon at the rate of 7% per annum from date of judicial demand until paid, which amount represents *265 expenses for the preservation of cattle for the period January 8, 1975, to September 30, 1975; and
2. Reserve defendant-appellee's right to claim, additionally, expenses incurred for the preservation of the said cattle subsequent to September 30, 1975.
Regarding the increase of the award for expenses, sought by defendant-appellee, we find no manifest error in the trial court's award for expenses for the preservation of the cattle during the period above mentioned. A reasonable evidentiary basis appears from the record, sufficient to sustain the trial court's award, and we find no manifest error in that award. Consequently, under the prevailing jurisprudence, we will not disturb same.
With reference to defendant-appellee Harry Friedman's second requested amendment, we find merit in his contention that his right to make a claim for such expenses incurred subsequent to September 30, 1975, should be reserved unto him. Accordingly, we would amend the judgment of the trial court to include the following:
"IT IS FURTHER ORDERED, AJUDGED AND DECREED that the right to claim expenses incurred for the preservation of the cattle subsequent to September 30, 1975, be reserved to Harry Friedman, Jr."
Costs of this appeal are to be borne by appellant, James Henry Williams.
AMENDED AND AFFIRMED.
WATSON, J., concurs and assigns reasons.
WATSON, Judge, concurring:
With reluctance I concur in the decision of the majority to affirm the judgment of the trial court.
My study of the medical and lay testimony convinces me that Mr. Williams was suffering "derangement of intellect" within the meaning of LSA-C.C. art. 1789 on the date the cattle were purchased and the note was executed.
However, despite a thorough and skillful job by his counsel, plaintiff ran into insurmountable difficulties in proving the second element of Article 1789, that: "the situation of the party and his incapacity were apparent". This latter element is a fact question and the voluminous record includes substantial evidence on both sides. While I may very well have decided the case differently in the trial court, my limited authority on appeal is that of reviewing the facts to determine whether the trier of fact had a reasonable evidentiary basis for his decision. It matters not that there may be an equally reasonable basis for a contrary decision because the appellate court is not entitled to substitute its judgment for that of the trier of fact. Canter v. Koehring Company, 283 So.2d 716 (La., 1973); Pierre v. Landry, 341 So.2d 891 (La., 1977); Wiley v. Travelers Insurance Company, 300 So.2d 555 (La.App. 3 Cir. 1974), writ denied, 303 So.2d 187 (La.); Mulcahy v. State Department of Corrections, 334 So.2d 509 (La.App. 1 Cir. 1976); Andrew v. State Farm Mutual Automobile Ins. Co., 316 So.2d 883 (La.App. 3 Cir. 1975).
Therefore, I respectfully concur.
NOTES
[1] The other case being Williams v. Friedman, Jr., Docket No. 5940 of this Court, 346 So.2d 265.
[2] C.C.Art. 1779.