449 So.2d 26 (1984)
Ernest MEADORS
v.
PACIFIC INTERNATIONAL PETROLEUM, INC., et al.
No. 83 CA 0385.
Court of Appeal of Louisiana, First Circuit.
February 28, 1984.
Rehearing Denied April 3, 1984.
Writ Denied June 1, 1984.
*27 James E. Kuhn, Denham Springs, for plaintiff Ernest Meadors.
John C. Christian, M. Taylor Darden, and David N. Schell, Jr., New Orleans, for defendant Mid-South Exploration.
Before SHORTESS, LANIER and CRAIN, JJ.
LANIER, Judge.
Mid-South Exploration Company, Inc. (Mid-South) suspensively appeals from a judgment of the trial court cancelling an oil, gas and mineral lease granted to Mid-South by plaintiff, Ernest Meadors.

FACTS
On February 9, 1976, Ernest Meadors was admitted to the hospital for surgery for a stomach ulcer. He was discharged on February 26, 1976. On February 18, plaintiff was visited in the hospital by his brother, James B. Meadors, and Arthur B. Hammond, an independent lease broker who was seeking to obtain a mineral lease for Mid-South on the Meadors' land.[1] Hammond had prepared a lease for plaintiff's signature, but upon being advised by plaintiff that he was in too much discomfort to talk business, Hammond agreed to meet with plaintiff after he left the hospital.
The facts are in dispute from this point. Hammond asserts that he left the hospital with the unsigned lease which he had already dated. Hammond further testified that he later met with Ernest Meadors and his two brothers at Ernest Meadors' home sometime after Meadors' release from the hospital. Hammond could not pinpoint the exact date this meeting occurred; however, he did remember discussing the major provisions of the lease with all three brothers after which each signed a separate lease.
The draft Hammond made out to Ernest Meadors for the lease was dated March 1, 1976, and there is strong indication that this was the date the lease was signed as well.
The lease that Ernest Meadors signed was the one that Hammond had originally taken to the hospital. The date on it reads "February 18, 1076 [sic]"the incorrect figure in the year resulting from a typing error on Hammond's part.
Mrs. Meadors deposited the draft, and all payments made under the lease were accepted by the Meadors until October of 1979 when the present suit was filed.
Plaintiff originally filed a petition of mandamus against the Livingston Parish Clerk of Court to cancel the lease. The suit was later amended to an ordinary proceeding to cancel the lease. The allegations of the original petition as amended requested cancellation of the lease on the following grounds:
1) The lease had expired on its face being dated February 18, 1076;
2) At the time of the alleged execution of the lease the plaintiff, Ernest Meadors, was incapable of execution of the contract;
3) That there was no consideration paid to Mr. Meadors; and

*28 4) Fraudulent conduct of the defendant.
Defendant, Mid-South, denied all grounds asserted by Meadors for cancellation. It further alleged that the lease was executed on or about March 1, 1976, that plaintiff accepted all payments due on the lease, and that plaintiff was guilty of laches and thus estopped from contesting the validity of the lease.
After trial on the merits, the trial judge found that the lease was executed on February 18, 1976, and Meadors was temporarily deranged on that date and thus incapable of executing the lease. The trial judge then rendered judgment cancelling the lease on the basis that there was a lack of consent necessary to bring about a valid contract which "effectively resulted in lack of consideration to the plaintiff."[2]
On appeal, Mid-South lists the following two assignments of error:
1. The court erred in cancelling the mineral lease on the grounds that plaintiff Meadors did not have capacity to contract, and thus there was failure of consent between the parties which resulted in a lack of consideration for granting the mineral lease. In particular, the court:
(a) Erred in holding that the mineral lease was executed on February 18, 1976, while Meadors was in the hospital.
(b) Erred in saying that even assuming the lease was executed on March 1, 1976, Meadors was incapable of executing any document on that date; and
(c) Erred in finding failure of consent and lack of consideration in the granting of this lease.
2. Additionally, the court erred in not holding that, by plaintiff's acceptance of the bonus and rentals payable under the lease, plaintiff had ratified the lease and was estopped from contesting its validity.

PROOF OF CAPACITY TO CONTRACT
It is necessary to the validity of a contract that the parties be legally capable of contracting. La.C.C. art. 1779. In the absence of a special exception the presumption is that all persons possess the capacity to contract. La.C.C. art. 1782; First National Bank of Shreveport v. Williams, 346 So.2d 257 (La.App. 3rd Cir.1977). La. C.C. art. 1788 recognizes insanity as evidenced by a judgment of interdiction, as one exception to the presumption. That exception is not applicable here. Another is recognized by La.C.C. art. 1789 which provides that "A temporary derangement of intellect, whether arising from disease, accident or other cause, also creates an incapacity pending its duration, provided the situation of the party and his incapacity were apparent". The plaintiff must prove that the mental incapacity existed at the time of the contract. See Emerson v. Shirley, 188 La. 196, 175 So. 909 (1937); Kleiner v. Ciko, 417 So.2d 54 (La.App. 1st Cir.1982), writ denied, 420 So.2d 457 (1982).
The exceptions to the presumption of capacity to contract must be shown quite convincingly and by the great weight of the evidence. "Where doubt exists as to the showing of an exception, the presumed capacity to contract prevails." First National Bank of Shreveport, 346 So.2d at 264. The trial court based its decision cancelling the lease on La.C.C. art. 1789. We hold that the decision of the trial court that the proof offered effectively rebutted the presumption of capacity to contract was in error and reverse.

DATE LEASE WAS SIGNED
In order to prove mental incapacity at the time of the execution of the contract, the plaintiff must first prove the time of execution. The trial judge concluded that the mineral lease in question was executed on February 18, 1976, while plaintiff was in the hospital. This conclusion was based on the fact that the lease bears the date of *29 February 18, and the trial court concluded that the defendant did not prove a different date. After review of the record, we are convinced that this finding of fact by the trial judge was clearly wrong.
Parole evidence is admissible between the parties to a contract to establish the correct date of execution of a contract when the date on the instrument is erroneous. Mount Olive Bank v. Jackson Air Taxi, Inc., 356 So.2d 1090 (La.App. 2d Cir. 1978), writ denied, 359 So.2d 207 (La.1978); Russell v. Armington, 162 So.2d 91 (La. App. 4th Cir.1964), application denied, 246 La. 350, 164 So.2d 352 (1964).
Plaintiff was hospitalized between February 9, 1976, and February 26, 1976. It is clear from the testimony elicited at trial that the lease was not signed while Ernest Meadors was in the hospital, but was signed at Meadors' home sometime after his discharge. Plaintiff makes much of the fact that the lease contained the following language:
"THIS AGREEMENT, entered into effective as of February 18, 1076[sic]."
The lease concludes:
"IN WITNESS WHEREOF, this instrument is executed as of the date first above written."
Hammond testified that he went with James Meadors to Ernest Meadors' hospital room on February 18, 1976, with the dated lease, but left when Meadors indicated he was in too much discomfort to talk business. Both James Meadors and Sam Digirolamo, plaintiff's son-in-law who was visiting Meadors at the time, testified that plaintiff did not execute the lease that day in the hospital. On the contrary, all of the witnesses who were present testified that the lease was signed by Meadors at his home after he was discharged from the hospital. The plaintiff himself admitted that he signed the lease at his home. Referring at trial to his deposition he testified:
A. That was the day that I signed the lease.
Q. The following question is where did that take place?
A. At my home.
It is obvious that plaintiff's lease was not signed on February 18, 1976, while he was hospitalized, but at his home sometime after his discharge on February 26, 1976. The trial judge's holding on this point was therefore in error.
There was considerable evidence in the record that the lease was signed on March 1, 1976, at plaintiff's home. None of the witnesses, including Hammond, could pinpoint the actual date the lease was signed, only that it was after Meadors' discharge from the hospital on February 26, 1976. However, the bonus draft executed by Hammond and given to plaintiff as consideration for the lease, was dated March 1, 1976, and Hammond testified that it would be unusual for a lease and its accompanying draft to be signed on different dates. There was no evidence refuting this or suggesting the lease was signed on another date. We therefore find that based upon a preponderance of the evidence the lease was signed by Ernest Meadors on March 1, 1976.[3]

CAPACITY TO CONTRACT
The question now becomes, did Ernest Meadors have the capacity to contract on March 1, 1976, when he signed the lease? The trial judge, in the written reasons for judgment which he adopted, stated that "even assuming that one concludes that the date the lease was actually signed was March 1, 1976, Mr. Meadors was nonetheless incapable of executing any documents on that date." The court found that Meadors was "temporarily deranged" under La.C.C. art. 1789, due to his illness and the medication he had been given. The appellant argues that, once again, the court was clearly in error. We agree.
*30 The record reflects the following evidence. Meadors was released from the hospital on February 26, 1976. On the following Sunday, his wife gave him some medicine to control diarrhea and vomiting. On Monday morning (March 1, 1976) she called Dr. McInnis and obtained a prescription for carbrital, which Dr. McInnis testified is a "medication ... designed to assist someone in sleeping." Mrs. Meadors claims to have given her husband two doses of carbrital that day over a 3½ hour periodonce in the morning and again in the early afternoon. The prescription read, "for Mr. Ernest Meadors, caps, carbrital, each grains, one and a half, dispense 30; one per hour of sleep if necessary." The plaintiff argues that since Mr. Meadors was given this medicine and was underweight due to the surgery, he was incapable of signing a lease on March 1, 1976.
Dr. McInnis testified that the plaintiff was considerably underweight after surgery. He also testified that the worse the physical condition the greater the effect of the drug. However, he was never asked to give an opinion on what effect the medicine which Meadors was given on March 1 might have had on his mental capacity. Instead, the plaintiff put that question to John Biglane, a pharmacist, who admitted that he did not know Meadors in February or March, 1976.
Biglane testified that the primary effect expected of the drug carbrital is sedation. Biglane did testify, after classifying carbrital as a bromide, that,
side effects with increased use and build-up of bromides include loss of memory, disorientation and also including standard procedure with just about any drug that's taken orally from skin rashes down to nausea or vomiting, gastrointestinal distress, in general, all the way down to loss of motor coordination, and coma, and even death, inyou know in, naturally, in excessive doses. (Our Emphasis)
However, we find no evidence of any "increased use and build-up" in this case.
In an effort to prove the alleged incapacitating side effects of the carbrital on Meadors, the plaintiff presented several witnesses who were present that night when Hammond came to Meadors' home. The witnesses who testified were plaintiff's two brothers, who also signed leases that night, and his son-in-law, Sam Digirolamo, who was a witness to Ernest Meadors' lease. Plaintiff relies on testimony by his brother, William Meadors, that plaintiff "looked like someone in a drunken stupor, lounging around in his pajamas," and testimony by Digirolomo that Meadors was "incompetent." However, on review of Digirolomo's testimony, it appears that he was referring to Meadors' physical incompetence. All of the plaintiff's witnesses testified that it was apparent that Meadors was on medication that night. On the other hand, Hammond testified that although Meadors appeared "drawn and pulled down, as anyone would have after such an operation," mentally, he was "perfectly alert and lucid and clear, and nobodythere was no slightest [sic] indication from any of the family that therehe wasn't under [sic] disability whatsoever at the time...."
We find the most significant testimony to be that of Meadors himself. For a man who claimed at trial that he was so incapacitated at the time the lease was signed that he remembered nothing about the lease, it is surprising how well he remembered several detailed provisions of the lease when his deposition was taken on January 19, 1981. We excerpt the following from Meadors' deposition, which he read into the record at trial:
Q. Are you familiar with the terms of this lease, in particular the provisions?
A. Well, I will answer you this way, that all I know that one-eighth royalty was, to my knowledge, was right. That's what the agreement was. But I don't know the date like I told you or the day that I signed the lease. And my impression was at the time of signing the lease was for five years not ten.

*31 Q. Did you understand the amount of the bonus that you were being paid?
A. Yes, sir.
Q. On your signature of the lease?
A. Yes, I did.
Q. Was that explained to you by anyone, Mr. Hammond or your brothers?
A. I believe Mr. Hammond explained it to us.
Q. Did he also explain the delay rental payment?
A. Yes, sir.
It is obvious after reading Meadors' testimony that, despite the two doses of carbrital he might have been given on March 1, 1976, he was not mentally incapacitated at the time the lease was explained to him and he signed it. In fact, the record reflects that Mr. Meadors did not question his lease until he heard from the neighbors what they were getting paid for leasing their mineral rights.
Mental incapacity is not established by proof of poor physical condition, nor is it established by proof that the plaintiff was on medication. The plaintiff must prove "quite convincingly and by the great weight of the evidence" that he was mentally incompetent at the time the lease was executed. First National Bank of Shreveport, 346 So.2d at 264. Since the record demonstrates that plaintiff has failed to meet that burden, he is presumed to have possessed the mental capacity to contract.

DECREE
For the foregoing reasons, the judgment of the district court is reversed and judgment is rendered in favor of Mid-South dismissing the petition with prejudice. Meadors is cast for all costs.
REVERSED AND RENDERED.
NOTES
[1] Ernest Meadors owned the biggest part of the Meadors brothers' land19.98 acres.
[2] We note from the record that the written reasons for judgment signed by the trial judge on January 10, 1983, were not written by the trial judge, but were provided by the plaintiff and adopted by the trial court.
[3] It is necessary for plaintiff to prove his incapacity at the time he executed the contract. Thus, a determination of the date the lease was signed is a necessary element in proving an incapacity to contract.